IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

JOSEPH ELBERT CLEMENTS, #105568,   )
a.k.a., Joe Elbert Clemments,                          )
a.k.a., Joseph Albert Clemments,                    )
a.k.a., Joe Cassidy,                                         )
                                                                         )
       Petitioner,                                          )
                                                                         )
v.                                                                        )          CASE NO. 2:09-CV-685-WHA
                                                                         )                       [WO]
                                                                         )
DAVID WISE, et al.,                                      )
                                                                         )
       Respondents.                                       )

**RECOMMENDATION OF THE MAGISTRATE JUDGE[1]**

**I.  INTRODUCTION AND PROCEDURAL HISTORY**

This civil action is before the court on a 28 U.S.C. § 2254 petition for writ of habeas

corpus filed by Joseph Elbert Clements ["Clements"], a state inmate, on July 19, 2009.  In

this petition, Clements challenges convictions for unlawful manufacturing of a controlled

substance, trafficking in a controlled substance and unlawful possession of drug

paraphernalia imposed upon him by the Circuit Court of Covington County, Alabama on

June 30, 2005.[2]

After a suppression hearing on the admissibility of evidence obtained during a

---

[1] All exhibit page numbers referenced herein are those assigned by this court in the docketing process.

[2] The convictions relate to the production and possession of methamphetamine on property owned by Clements'
father and on which Clements resided.

search of Clements' residence, two other buildings on the residential property and a vehicle belonging to Joseph Thompson parked on the property, the trial court denied the motion to suppress and deemed the evidence admissible. *Respondents' Exhibit 1 (Part 1) - Court Doc. No. 11-1* at 29-145. During the trial of Clements' case, the State presented evidence which detailed the process of manufacturing methamphetamine utilizing the red phosphorous reduction method - the method at issue and most common method of manufacturing methamphetamine, the ingredients necessary to the production of methamphetamine when using this production method and the materials used in this particular manufacturing process.[3] Specifically, Paul Dean, an officer with the Andalusia Police Department and member of the Covington County Drug Task Force certified by the

---

[3]The trial court allowed the State's witness to reference items not seized during the search of Clements' property to aid the jury in understanding the process associated with the manufacture of methamphetamine. The State did not introduce the items as evidence and the relevant testimony clearly demonstrated the items were not seized during the search of Clements' residence or adjacent property. Prior to the admission of testimony related to the aforementioned items, the written transcript indicates the court advised the jury that these items "are solely for the purpose of helping you understand how a meth lab works. They were seized in this case. They are not evidence of a defendant's guilt. They are not any illegal items that were in the possession of the defendant or anyone connected with him. They have absolutely no purpose in this case except to help you understand how a meth lab works. So when you look at them, don't think, Aha, that was something that the defendant had or somebody that was with him had. They are not. They are just somethings [the witness] wants to show you to help you understand how this thing operates." *Respondents' Exhibit 1 (Part 1) - Doc. No. 11-1* at 166. Subsequently, the trial court interrupted the witness to again caution the jury that the instructional items were not evidence in the case. *Id*. at 181-182 ("I'm sorry. Let me interrupt you one time. I don't mean to beat it to death to the point where it sounds silly, but I'm supposed to be very careful about this. The items that you just saw, none of them have to do with this particular case insofar as having been found in connection with the case. They are simply examples that [the witness] has shown you to help explain what he's going to be explaining to you. They are not to be considered as something found in this case or evidence in this particular case. They are just a demonstrative exhibit. So please keep that in mind...."). Upon a challenge by Clements in his Rule 32 post-conviction petition to the transcription that the items "were seized in this case[,]" the trial judge listened to the tape recording of the challenged instruction and determined "the language defendant ... complains of is merely a scrivener's error, and was not, in fact, used.... What the Court actually told the jury was this: 'Ladies and gentlemen, these items that you are about to be shown are solely for the purpose of helping you understand how a meth lab works. They were **not** seized in this case.'" *Respondents' Exhibit 10 - Doc. No. 11-15* at 52.

Drug Enforcement Agency in clandestine methamphetamine laboratory investigation,

provided testimony which established:

> There are three [requisite] ingredients that are used [in producing methamphetamine].... One of them is pseudoephedrine hydrochloride. That is the active ingredient in a lot of the cold medicines....
>
> Very simply, the [cold tablets] ... will be placed in like a drink bottle ..., water poured in on top of them.... And they are set -- you just set them aside to let them dissolve. [After dissolution], there is a white sediment [which forms]. This is the binder of the pill, the pseudoephedrine is contained in the water. That liquid [containing the pseudoephedrine is then] poured through a coffee filter, and the liquid would go into some type of glass cookware. You evaporate the water and what you have left is the pseudoephedrine.
>
> That's one item I would need. Another item that you would need are iodine crystals. This is a small container that has some iodine crystals here.
>
> The third item is red phosphorous.... It's a course brown material, kind of like course sand..... [The red phosphorous is usually obtained] from the striker plates of matches such as the little book matches.... The red phosphorous is taken off the little striker plate [of the matchbook]. And the way that happens is they actually take and cut this striker plate off -- they gather numerous striker plates, put them into a container, put a type of solvent, acetone, denatured alcohol, something like that, in on top of them. It breaks down the glue, the phosphorous falls off. You pour that through a coffee filter, pick out the little pieces of paper and what is left in the coffee filter is red phosphorous.
>
> From that point it is put through a cooking process. Basically what they are doing is heating it up. All these certain amounts of these three items were placed into a container. You heat the items up and a chemical reaction takes place and the pseudoephedrine hydrochloride is converted into methamphetamine.
> * * *
> .... [Upon completion of the conversion, the substance is] about the color of the red phosphorous, that reddish brown color. But a lot of times it will be the consistency of peanut butter. It's a real thick, pasty substance.
> * * *
> .... Once the cooking process is done, the meth is manufactured. The

3

rest of this is an extraction process [which involves] ... [r]emoving [the methamphetamine] out of this pasty stuff.

* * *

.... [The extraction process involves removing the methamphetamine from] this red paste and changing it into a usable form. Something that can be used. The first -- You put all these chemicals together. There is water is added to it. Okay? So once this is converted, this substance has a water base to it, a fuel is added to it, a charcoal lighter fluid or Coleman Camp Fuel, some kind of camping fuel like you put in a camping stove. That is added to it. All right? At that point you have a bi-layered liquid. Oil and water do not mix, if you think about it. Fuel and water to not mix, if you think about it under those circumstances.

At that point Red Devil Lye is added to it, which is a drain cleaner, or drain opener. That's for the purpose of neutralizing the Ph level of this substance. When that happens, then the drug is actually pulled out of the pasty stuff up into the fuel. Now the fuel layer will be drawn off of this and then water added to it. Again, fuel and water don't mix.

So you still have a bi-layered liquid. At that point muriatic acid is added to it, which is brick cleaner [to get the fuel and water separated]. The water layer will be on the bottom, the fuel layer is on the top.

Well, to get that -- you can't pull the fuel out first. The person wants the water out first because if you add the fuel into it and you heat it up, you know what happens, you have a fire.

* * *

.... [Y]ou ... heat this water up to evaporate it so that you can -- just like you did with the pseudoephedrine. You will end up with the meth. But your fuel is on top. So a lot of times what they do is they will punch a hole -- a person will punch a hole in the top of the bottle cap, take the bottle and invert it [so the water is now at the end with the bottle cap].... They move their finger, squirt that liquid into a cookware dish, evaporate the water, and what is left is the methamphetamine.

* * *

It's a white crystalline-looking powder. It's like a powder substance.

* * *

Meth oil is meth in a non-usable form. Meth oil is meth base. Okay? The finished product is methamphetamine hydrochloride. It's powder form. Base is a liquid form you can't smoke. And methamphetamine hydrochloride is a powder form that can be smoked, snorted, eaten, mixed into a drink, or

4

injected, basically however a person decided they wanted to use it.
* * *

      The most common form [of methamphetamine use] that we see is smoking it.  Most common paraphernalia we find are smoking devices.  Of those smoking devices, the most common drug paraphernalia we find .... [is] just a regular incandescent light bulb like you would have at home.  The filament end of the light bulb is knocked out.  You can see there is a hole here.  And the glass is heated up and someone just blows through it and it pops a hole in it and the drug will be dropped down inside this glass.  You heat it up.  And as it starts to melt and smoke starts to form a person can just inhale through the light bulb -- the air will come through the hole, pick up the drug and take it into the lungs.  And that's the way it's ingested.  But that's the most common form that we see.
* * *

*Respondents' Exhibit 1 (Part 1) - Doc. No. 11-1 at 167-175.*  Later in his testimony, Dean

advised:

      ....  Hydrogen peroxide is [also] used in the manufacturing process.  It can be used in a couple of different ways.  One is in the assistance of obtaining iodine crystals from tincture of iodine.
* * *

      With a mixture of tincture of iodine, hydrogen peroxide, water, and one other chemical [an individual can produce iodine crystals].  All of those mixed together and then iodine crystals would actually form in that solution and just fall into the bottom of the container.  And then that would be poured through a coffee filter and the crystals would actually be trapped in the coffee filter.

*Respondents' Exhibit 1 (Part 2) - Doc. No. 11-2 at 26-27.*  Dean also testified that burn

piles are commonly located adjacent to clandestine methamphetamine labs in an effort to

destroy evidence associated with various related illegal activities.  *Id*. at 29.

      The evidence introduced by the State further demonstrated that during the search of

5

the property, law enforcement officers observed in the shed adjacent to the residence an electric wok containing a clear liquid, a microwave oven, a surveillance monitor exhibiting a view of the front of the residence including the driveway, two large Mason jars containing a bi-layered liquid, a Mt. Dew plastic bottle containing extraction material, a Dr. Pepper plastic bottle containing tincture of iodine, a clear plastic bottle containing red phosphorous, a Dasani water bottle containing water and a pill bottle containing iodine crystals.  In burn piles located on the property, officers found broken light bulbs that appeared to have been fashioned into smoking devices, a partially burned bottle of hydrogen peroxide and three large cans consistent with the type of cans which contain acetone and/or camp fuel.  In the bed of Thompson's truck, officers located a portable methamphetamine lab within an off-white plastic tub comprised of several plastic soft drink bottles containing bi-layered liquid, muriatic acid and water, a one-gallon jug containing a bi-layered liquid, a container of Red Devil Lye, a bottle of Gulf Lite charcoal lighter fluid, aluminum wire, a Tylenol bottle containing an off-white substance, rubber gloves and coffee filters, a white glass cookware dish and bottle of acetone beside the plastic tub, and night vision goggles in the cab of the truck.  The State introduced photographs of these items into evidence.  *Respondents' Exhibit 1 (Part 5) - Doc. No. 11-5* at 108-117; *Respondents' Exhibit 1 (Part 6) - Doc. No. 11-6* at 2-14.

Officer Dean collected samples from the liquid substances for purposes of forensic

testing, placed the samples in a cardboard box for transport to the Department of Forensic Sciences, identified the box as evidence, sealed the box and marked the box with pertinent identifying information. *Respondents' Exhibit 1 (Part 2) - Doc. No. 11-2* at 29. Officer Mark Odom then secured custody of the evidence samples and transported them to the forensic lab for analysis. *Id*. at 121. John Brunner, a chemist employed at the Dothan Division of the Alabama Department of Forensic Sciences received the evidence from Officer Odom. *Id*. at 127. Brunner analyzed the samples provided to him and five of the samples extracted from the substances revealed the presence of methamphetamine. *Id*. at 132. In analyzing the substances, Brunner utilized methods which are generally accepted in the scientific community. *Id.* at 135. Specifically, Brunner removed a sample, determined the weight of the sample, "gassed it with hydrochloric acid ... then evaporated it" revealing methamphetamine. *Id*. at 132. The liquid substances seized from the outbuilding adjacent to Clements' residence contained 74 grams of methamphetamine and 136.5 grams of pseudoephedrine. *Id.* at 133-134. The liquid substances seized from the bed of Thompson's truck contained 254.6 grams of methamphetamine. *Id*. at 132-135. The total calculated weight for the methamphetamine seized equaled 328.6 grams. *Id*. at 135.

Based on the evidence presented at trial, a duly empaneled jury found Clements guilty of manufacturing a controlled substance, trafficking in a controlled substance and

7

possession of drug paraphernalia. The trial court sentenced Clements as a habitual felony offender to consecutive sentences of life imprisonment for the manufacturing and trafficking convictions and one year for the drug paraphernalia conviction.[4]

Clements filed a direct appeal of his convictions in which he argued: (1) The trial court erred in denying his motion to suppress; (2) The State failed to prove the petitioner had knowledge of the controlled substances made the basis of his convictions; and (3) The indictment was void as it did not contain the petitioner's true name. *Respondents' Exhibit 2 - Court Doc. No. 11-7* at 12.[5]  On August 18, 2006, the Alabama Court of Criminal Appeals affirmed Clements' convictions in an unpublished memorandum opinion. *Respondents' Exhibit 4 - Court Doc. No. 11-9.*  The appellate court's opinion, in relevant part, reads as follows:

> Testimony presented at the suppression hearing established that in early December 2004, several incidents occurred that drew the attention of Officer Paul Dean of the Covington County Drug Task Force to the residence of the appellant Joseph Elbert Clements (hereinafter "Clements") and his father, J. W. Clements. While looking for Brady Kirksey, a "person of interest" in a robbery and attempted murder investigation, Officer Dean learned that Brady [Kirksey] was known to "hang out" at the Clements residence. Thereafter, on December 8, Dean received a report from a concerned citizen of a party and possible drug activity occurring at the Clements residence. Officer Dean drove by the residence and saw nothing that merited further investigation. Because he had no legal basis for any further action, Officer Dean drove past the residence without stopping.

---

[4]Corey Bryan represented Clements at trial and sentencing.

[5]Anthony J. Bishop represented Clements during the direct appeal of his convictions.

On December 9, Officer Dean learned that the Department of Human Resources ("DHR") planned to investigate a report that [Autumn] Perry and her minor children were living in a home where reported drug activity was occurring. Perry, who was pregnant, and her children were living at the Clemments residence. Later that day, law enforcement officials accompanied a DHR social worker to the residence to investigate this allegation. Because there were several adults on the premises, responding officers requested back-up assistance for their safety; Officer Dean was one of the responding back-up officers. When officers approached Autumn Perry, she was standing next to Clemments, who was performing mechanical work on her car. The DHR worker explained the reason for the visit and asked Perry to step inside to discuss the allegations. The DHR worker, Perry, Clemments, and law enforcement officers -- including Officer Dean -- entered the residence. They learned that the house belonged to Clemments's father, and that the younger Clemments lived in the residence with his father.

Officer Dean asked Clemments if he could look around the house. At trial, Officer Dean testified that he did not consider this a formal search of the residence; he was merely scanning the residence looking for Brady Kirksey. While looking through Clemments's bedroom, Officer Dean saw Brady's brother, Brandon Kirksey, and Ashley Aldrich. After he completed his inspection of the house, Officer Dean asked Clemments if he would show him the rest of the buildings behind the house. Clemments agreed, and the two men proceeded to the horse barn.

After the inspection of the horse barn, Clemments took Officer Dean to a metal storage shed behind the house. In the storage shed, Officer Dean noticed a microwave on the floor with a mini-television sitting on top of it. Upon closer inspection, Officer Dean noted that the wires from the television indicated that it was a surveillance monitor. Officer Dean turned the monitor on to see if it was functional. Officer Dean then noticed an electric wok and a white box in the storage shed. Knowing that the manufacture of methamphetamine required a heat source, Officer Dean suspected that methamphetamine production was taking place in the storage shed. Officer Paul Hudson noticed a red cooler and he asked Clemments if he could investigate the contents of the cooler. Clemments indicated that Officer Hudson could open the cooler. When Officer Hudson opened the cooler, Officer Dean observed various items typically associated with the production of methamphetamine.

Officer Dean, who is certified by the Occupational Safety and Hazard

Administration to process methamphetamine labs, testified that there are three primary ingredients required to manufacture methamphetamine: pseudoephedrine hydrochloride, red phosphorous, and iodine crystals. These ingredients are processed to create methamphetamine oil, which is a non-consumable form of methamphetamine. The methamphetamine oil is heated and dehydrated to form methamphetamine chloride, which results in a powder. Officer Dean stated that he saw two mason jars containing a bi-layered liquid and two plastic bottles -- one of which appeared to contain pseudoephedrine extraction -- inside the red cooler.

At this point, Clemments was handcuffed and detained. Upon the request of law enforcement officers, Clemments consented to a search of his bedroom. Simultaneously, Officer Scott Connor got J.W. Clemments to sign a consent to search form so that a search could be conducted of his property. Officers found clear fluid in the electric wok and in a soft drink bottle; they also found a plastic bag containing red phosphorus that had been removed from the strike plates of match books. In addition, during the search of the property, Officer Dean found three separate "burn piles" that are commonly found in association with the manufacture of methamphetamine as an attempt to hide illegal activity. Officer Dean testified that such burn piles are necessary to discard components of methamphetamine production because such chemical waste is combustible if disposed of with regular waste. In one of the burn piles, Officer Dean found a bottle of hydrogen peroxide, a solution used to create iodine crystals, and hand-crafted smoking devices created from light bulbs that are commonly used to smoke methamphetamine.

While searching the premises, Officer Dean also searched a vehicle belonging to Joey Thompson, who was found hiding in the attic insulation in the horse barn. During the search of Thompson's truck, Officer Dean found a round plastic container containing the materials necessary for another methamphetamine lab and pieces of glass cookware necessary for extracting pseudoephedrine for methamphetamine production. Officer Dean also found night-vision goggles in Thompson's truck, which are often associated with counter-surveillance in methamphetamine production. Upon further investigation, Officer Dean learned that the night-vision goggles belonged to Brandon Kirksey's step-father and that Brandon had spent the night at the residence.

Officer Dean began processing the methamphetamine lab according to standard protocol. He took samples of the suspicious liquid[s] from the suspicious containers, sealed them, and placed them in a sealed box. The box

was delivered to evidence custodian and Drug Task Force Officer Mark Odom. The box was maintained in the evidence locker at the Covington County Sheriff's Office, then transported to the Alabama Department of Forensic Sciences in Dothan for testing. At trial, Forensic Scientist John Brunner testified that five of the ten liquid substance samples submitted by law enforcement contained a total of 328.6 grams of methamphetamine and one of the samples contained 136.5 grams of pseudoephedrine.

## I.

Clemments argues that the trial court committed reversible error when it denied his motion to suppress the evidence seized during the consensual search of his father's property. Specifically, he argues that law enforcement officers had no reasonable suspicion grounds upon which to ask for consent to search the property and that his consent was involuntary because he felt compelled to comply with the request of law enforcement officials.

The record reveals that, at the suppression hearing, Clements specifically argued that he did not consent to the search. He states that Officer Walter Inabinett "shoved" him through the house while keeping his hand on his gun; and that Officer Dean ordered him to show them the property. However, on appeal, Clemments argues that law enforcement officers did not have the requisite reasonable suspicion to conduct the search based on his giving consent.

The record reveals that Clemments did not object at the suppression hearing based on the grounds he now argues on appeal. "Specific grounds of objection waive all other grounds not specified at trial." *Smith v. State*, 602 So. 2d 470, 472 (Ala. Crim. App. 1992). Therefore, this issue has not been preserved for review.

In any event, the evidence established [Clements] consented to a search of the property [prior to the discovery of any evidence]. The question of whether a consent to search was in fact "voluntary" or was a product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances.'" *Miller v. State*, 602 So. 2d 488, 491 (Ala. Crim. App. 1992) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)). See also *Bender v. State*, 687 So. 2d 219, 221 (Ala. Crim. App. 1996).

> "'When conflicting evidence is presented on the issue of the voluntariness of a consent to search and the trial judge finds that the consent was voluntarily given, great weight must be

11

given his judgment.' *Cook v. State*, 637 So.2d 229, 231 (Ala. Crim. App. 1994); *Ball v. State*, 592 So.2d 1071, 1074 (Ala. Crim. App. 1991). '[A] trial court's ruling based upon conflicting evidence given at a suppression hearing is binding on this court and is not to be reversed absent a ,clear abuse of discretion.' *Jackson v. State*, 589 So.2d 781,784 (Ala. Crim. App. 1991),"

*Rokitski v. State*, 715 So.2d 859, 862 (Ala. Crim. App. 1997).

Although conflicting evidence was presented at the suppression hearing concerning whether ... Clements consented, there was sufficient evidence from which the trial court could determine that [Clements] did, in fact, consent to the search [prior to the observance/seizure of any evidence].... Based on the foregoing evidence, the trial court properly denied Clemments's motion to suppress.

## II.

Next, Clemments argues that the trial court erred when it denied his motion for judgment of acquittal because the State's evidence was insufficient to support a prima facie case for the instant convictions. Specifically, he contends that the State failed to prove that he had knowledge of the methamphetamine.

"'In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" *Ballenger v. State*, 720 So.2d 1033, 1034 (Ala. Crim. App. 1998), quoting *Faircloth v. State*, 471 So.2d 485, 488 (Ala. Crim. App. 1984), aff'd, 471 So.2d 493 (Ala.1985). "'The test used in determining the sufficiency of evidence to sustain a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found the defendant guilty beyond a reasonable doubt.'" *Nunn v. State*, 697 So. 2d 497, 498 (Ala. Crim. App. 1997), quoting *O'Neal v. State*, 602 So.2d 462, 464 (Ala. Crim. App. 1992). "'When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" *Farrior v. State*, 728 So.2d 691, 696 (Ala. Crim. App. 1998), quoting *Ward v. State*, 557 So.2d 848, 850 (Ala. Crim. App. 1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge

whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." *Ex parte Bankston*, 358 So. 2d 1040, 1042 (Ala. 1978). """[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine."" *Johnson v. State*, 555 So.2d 818, 820 (Ala. Crim. App. 1989), quoting Harris v. State, 513 So.2d 79, 81 (Ala. Crim. App. 1987), quoting in turn *Byrd v. State*, 24 Ala. App. 451, 451, 136 So. 431, 431 (1931).

> "'In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude. *United States v. Black*, 497 F.2d 1039 (5th Cir. 1974); *United States v. McGlamory*, 441 F.2d 130 (5th Cir. 1971); *Clark v. United States*, 293 F.2d 445 (5th Cir. 1961).

> """[W]e must keep in mind that the test to be applied is not simply whether in the opinion of the trial judge or the appellate court the evidence fails to exclude every reasonable hypothesis but that of guilt; but rather whether the jury might so conclude. *Harper v. United States*, 405 F.2d 185 (5th Cir. 1969); *Roberts v. United States*, 416 F.2d 1216 (5th Cir. 1969). The procedure for appellate review of the sufficiency of the evidence has been aptly set out in *Odom v. United States*, 377 F.2d 853, 855 (5th Cir. 1967).

> """Our obligation, therefore, is to examine the record to determine whether there is any theory of the evidence from which the jury might have excluded every hypothesis except guilty beyond a reasonable doubt. *Rua v. United States*, 5 Cir., 1963, 321 F.2d 140; *Riggs v. United States*, 5 Cir., 1960, 280 F.2d 949. In Judge Thornberry's words, """... the standard utilized by this Court is not whether in our opinion the evidence and all reasonable inferences therefrom failed to exclude every hypothesis other than guilt, but rather whether there was evidence from which the <u>jury</u> might reasonably so conclude." *Williamson v. United States*, 5th Cir., 1966, 365 F.2d 12, 14. (Emphasis supplied).

""""The sanctity of the jury function demands that this court never substitute its decision for that of the jury. Our obligation is [to] examine the welter of evidence to determine if there exists any reasonable theory from which the jury might have concluded that the defendant was guilty of the crime charged." *McGlamory*, 441 F.2dat 135 and 136."

"*Cumbo v. State*, 368 So.2d 871, 874-75 (Ala. Crim. App. 1978).

"'Possession, whether actual or constructive, has the following three attributes: (1) "[A]ctual or potential physical control, (2) intention to exercise dominion and (3) external manifestations of intent and control."' *Wallace v. State*, 690 So.2d 534, 536 (Ala. Crim. App. 1996), quoting *Radke v. State*, 52 Ala. App. 397, 398, 293 So.2d 312, 313 (1973), aff'd,292 Ala. 290, 293 So.2d314 (1974).

""""When constructive possession is relied on, the prosecution must also prove beyond a reasonable doubt that the accused had knowledge of the presence of the controlled substances. *Campbell v. State*, [439 So.2d 718 (Ala. Crim. App.), rev'd on other grounds, 39 So. 2d 723 (Ala.1983)]; *Yarbrough v. State*, 405 So.2d 721 (Ala. Crim. App.), cert. denied, 40 So.2d 725 (Ala. 1981). This knowledge may be inferred from the accused's exclusive possession, ownership, and control of the premises. *Temple v. State*, 366 So.2d 740 (Ala. Crim. App. 1978). When the accused is not in exclusive possession of the premises, however, this knowledge may not be inferred unless there are other circumstances tending to buttress this inference. *Korreckt v. State*, 507 So.2d 558 (Ala. Crim. App. 1986); *Temple v. State*, [366 So.2d at 743]. While non-exclusive possession may raise a suspicion that all the occupants had knowledge of the contraband found, a mere suspicion is not enough. Some evidence that connects a defendant with the contraband is required. *Grubbs v. State*, 462 So.2d 995 (Ala. Crim. App. 1984); *Temple v State*."

"*Robinette v. State*, 531 So.2d 682, 686 (Ala. Crim. App. 1987), rev'd on other grounds, 531 So. 2d 697 (Ala. 1988).

". . . .

"'In *Temple v. State*, 366 So.2d 740 (Ala. Crim. App. 1978), this court

provided a non-exclusive list of circumstances that may establish a connection between a defendant and the contraband found on the defendant's property when the defendant is not in exclusive possession of the premises.

> """While the kinds of circumstances which may provide a connection between a defendant and the contraband are unlimited and will naturally depend on the facts of each particular case, 56 A.L.R.3d 948 (1974), it has generally been stated that:
>
>> """The kinds of circumstances which provide such connection are ... evidence that the defendant had substantial control over the particular place where the contraband was found ... [and] evidence that debris of the contraband was found on the defendant's person or with his personal effects....
>>
>> "'The kinds of evidence which might be relevant, but which by themselves do not add the necessary connection are ... evidence that showed the defendant's physical proximity to the contraband.'
>
> "9 Land and Water L.Rev. 236, 248-49 (1974)."
>
> '366 So.2d at 743.'
>
> "*Posey v. State*, 736 So.2d 656, 658-59 (Ala.Crim.App. 1997)."
>
> *Straughn v. State*, 876 So. 2d 492, 504-06 (Ala. Crim. App. 2003).
>
> * * *

Here, the State presented ample evidence from which reasonable jurors could find beyond a reasonable doubt that Clemments committed each element of the charged offenses, including the element that he had knowledge of the methamphetamine. The evidence tended to show that the contraband was found on the property of Clemments's father and that they occupied that property together. Because of the "burn piles" containing hand-fashioned methamphetamine smoking devices, precursor chemical containers, and other paraphernalia associated with the production and use of methamphetamine that were located around the barn and in open areas around the curtilage of the house, it would be highly unlikely that Clemments was unaware of the presence of the contraband. In addition, because the metal shed where the methamphetamine lab was discovered was close to the house and there was

an electric wok containing a suspicious substance in plain view, it is reasonable to conclude that Clemments had knowledge of the contraband in the shed. Likewise, it would be unlikely that Clemments was not aware of the surveillance equipment running from the shed to the backyard of the house. Moreover, Officer Dean testified that Clemments was doing mechanical work on Autumn Perry's car upon his arrival at the property and that mechanic's tools were located inside that shed. Clemments testified at the suppression hearing and stated that they had all been smoking methamphetamine earlier that morning and conceded that, because his father was elderly, it was not likely that he had produced the contraband. Clearly, there was ample evidence from which a rational jury could find that Clemments had knowledge of the methamphetamine and that the evidence supported guilty verdicts on all three counts against Clemments. Therefore, the trial court did not err in denying Clemments's motions for a judgment of acquittal.

* * *

*Respondent's Exhibit 4 - Court Doc. No. 11-9* at 2-12.

Clements filed an application for rehearing which the Alabama Court of Criminal Appeals denied on September 8, 2006. *Respondents' Exhibit 6 - Doc. No. 11-11*. Clements then filed a petition for writ of certiorari with the Alabama Supreme Court. The Alabama Supreme Court denied the petition for writ of certiorari on November 9, 2006, *Respondents' Exhibit 8 - Court Doc. No. 11-13*, and the Alabama Court of Criminal Appeals issued the certificate of judgment on this same date. *Respondents' Exhibit 9 - Court Doc. No. 11-14*.

On June 26, 2007, Clements filed a *pro se* state post-conviction petition pursuant to Rule 32 of the Alabama Rules of Criminal Procedure with the Circuit Court of Covington County, Alabama in which he raised claims of ineffective assistance of appellate

16

counsel.  Specifically, Clements alleged appellate counsel failed to raise on direct appeal ineffective assistance of trial counsel for counsel's failure to (i) object to an alleged erroneous statement made by the trial court during its advisements to the jury regarding the use of instructional items as the transcript indicates that at one point the judge stated the visual aids were seized from the petitioner, (ii) challenge the illegal search and seizure of a surveillance monitor by officer Dean when Dean did not have the petitioner's permission to activate the monitor, (iii) object to admission of evidence regarding the presence of methamphetamine because the forensic chemist added an ingredient, hydrochloric acid, in his analysis of the samples thereby altering the original substance and rendering the substance different from that seized from the petitioner, (iv) object to the jury instruction on accomplice liability with respect to an individual's promotion and assistance in the commission of a crime, (v) object to the jury instruction provided on the definition of possession where the trial court did not provide a separate instruction defining the element of intent, and (vi) object when the trial court failed to instruct the jury on a necessary element of first degree unlawful manufacturing of a controlled substance, i.e., that the clandestine methamphetamine lab was within 500 feet of a residence, place of business, church or school.[6]

---

[6]The pertinent statute reads as follows:
"A  person commits the crime of unlawful manufacture of a controlled substance in the first degree if he or she [manufactures a controlled substance or possesses a precursor substance] and one or more of the following conditions occurred in conjunction with that violation:
(1) Possession of a firearm.

On December 15, 2008, the Circuit Court of Covington County issued an order

denying Clements relief on the claims raised in his Rule 32 petition. *Respondents' Exhibit*

*10 - Court Doc. No. 11-15* at 51-53. Clements appealed the denial of his Rule 32 petition

raising the same claims as those presented to the trial court. The Alabama Court of

Criminal Appeals issued a memorandum opinion on April 17, 2009 affirming the trial

court's decision to deny post-conviction relief. *Respondents' Exhibit 12 - Court Doc. No.*

---

(2) Use of a booby trap.

(3) Illegal possession, transportation, or disposal of hazardous or dangerous materials or while transporting or causing to be transported materials in furtherance of a clandestine laboratory operation, there was created a substantial risk to human health or safety or a danger to the environment.

(4) A clandestine laboratory operation was to take place or did take place within 500 feet of a residence, place of business, church, or school.

(5) A clandestine laboratory operation actually produced any amount of a specified controlled substance.

(6) A clandestine laboratory operation was for the production of controlled substances listed in Schedule I or Schedule II.

(7) A person under the age of 17 was present during the manufacturing process."

*Ala. Code* § 12A-12-218(a)(1-7)

The indictment issued against Clements listed three of the seven conditions contained in *Ala. Code* § 13A-12-218(a) as factors which when two or more of these conditions occurred during the manufacture of the controlled substance increase the offense from unlawful manufacture of a controlled substance in the second degree to unlawful manufacture of a controlled substance in the first degree. Specifically, Count I of the indictment alleged Clements did unlawfully manufacture a controlled substance, methamphetamine, and possessed a precursor substance, pseudoephedrine, with the intent to unlawfully manufacture a controlled substance, and in conjunction with this offense "A CLANDESTINE LABORATORY OPERATION WAS TO TAKE PLACE OR DID TAKE PLACE WITHIN 500 FEET OF A RESIDENCE ... AND/OR A CLANDESTINE LABORATORY OPERATION ACTUALLY PRODUCED ANY AMOUNT OF A SPECIFIED CONTROLLED SUBSTANCE, TO-WIT: METHAMPHETAMINE AND/OR A CLANDESTINE LABORATORY OPERATION WAS FOR THE PRODUCTION OF A CONTROLLED SUBSTANCE ..., TO-WIT: METHAMPHETAMINE...." *Respondents' Exhibit 1 (Part 4) - Doc. No. 11-4* at 48. As is clear from the foregoing, the State need only prove two of these three conditions. A review of the record in this case reveals the evidence presented at trial, including testimony and photographs, indicated the methamphetamine labs were located in close proximity to a residence. In addition, the evidence presented at Clements' trial clearly established that a clandestine laboratory operation was assimilated for the production of a controlled substance, i.e., methamphetamine *and* this lab actually produced methamphetamine. Thus, in this case and as determined by the state courts on review of Clements' Rule 32 petition, the condition regarding proximity to a residence did not constitute an essential element of the offense as the State proved two other requisite conditions establishing unlawful manufacture of a controlled substance in the first degree.

18

*11-17.* The portion of this opinion relevant to the instant case reads as follows:

> The appellant argues that his appellate counsel rendered ineffective assistance because he did not raise on appeal the following ineffective-assistance-of-trial-counsel allegations:
>
>> 1) trial counsel did not object to the trial court's allegedly erroneous jury instruction that visual aids were seized from him;
>>
>> 2) trial counsel did not object to the allegedly illegal search and seizure of a surveillance monitor that was used as evidence against him;
>>
>> 3) trial counsel did not object to allegedly improper forensic evidence on the basis that the addition of chemicals for testing purposes allegedly tainted the evidence officers seized;
>>
>> 4) trial counsel did not object to the trial court's instructions and reinstructions regarding how to determine whether he was an innocent bystander, an accomplice, or a participant in the offenses;
>>
>> 5) trial counsel did not object to the trial court's jury instruction on possession based on the fact that the trial court did not define the element of intent; and
>>
>> 6) trial counsel did not object to the trial court's jury instruction that one of the elements alleged in the indictment that could establish first-degree manufacturing was that a clandestine laboratory operation took place within 500 feet of a residence when the evidence allegedly did not establish that the laboratory was within 500 feet of the residence.
>
> To prevail on an ineffective-assistance-of-counsel claim, the appellant must show that his counsel's performance was deficient and that counsel's deficient performance prejudiced him. *See Brown v. State*, 663 So. 2d 1028 (Ala. Crim. App. 2 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052; 80 L. Ed. 2d 674 (1984)).
>
> Initially, we note that, after the appellant was convicted and sentenced, his counsel pursued a motion for a new trial and requested a transcript of the trial proceedings. There were some delays in getting the transcript, but the trial court indicated that it was willing to wait until the transcript was complete to conduct a hearing on the motion for a new trial.

However, the appellant was not willing to wait and instead chose to proceed without a transcript of the trial proceedings. Therefore, we question whether appellate counsel could have raised the above-referenced ineffective-assistance-of-trial-counsel allegations during the hearing on the motion for a new trial and on direct appeal because of the appellant's actions.

Moreover, in its order dismissing the petition, the circuit court adopted the State's response in which the State argued that the appellant and his father consented to a search of the residence, that the forensic testing was performed properly, and that the court's jury instructions were proper and in accordance with the law. [The circuit court] also noted the following with regard to the appellant's claims:

"A.  Defendant says, under his ISSUE I, that the Court improperly instructed the trial jury about demonstrative aids exhibited to them, as follows, to-wit: 'Ladies and gentlemen, these items that you are about to be shown are solely for the purpose of helping you understand how a meth lab works. They were seized in this case.' However, the language defendant thus complains of is merely a scrivener's error, and was not, in fact, used. The Court has, at this point, actually gone back and listened to the sound recording of this part of defendant's trial. What the Court actually told the jury was this: 'Ladies and gentlemen, these items that you are about to be shown are solely for the purpose of helping you understand how a meth lab works. They were **not** seized in this case.' Further, in this regard, the tape from which the disputed language was taken is available if the appellate court wishes to hear it. Thus, there is no merit to this particular claim about the jury charge.

"B.  Defendant says, under his ISSUE II , that illegally seized evidence was admitted against him at trial. I find, upon review of the record, however, that the evidence which the defendant complains about was not illegally seized. Thus, there is no merit to this particular claim.

"C.  Defendant says, under his ISSUE III, that an improper analysis of chemical evidence was admitted against him at trial. I find, upon review of the record, however, that the analysis which the defendant complains about was not improper. Thus, there is no merit to this particular claim.

20

"D. Defendant says, under his ISSUE IV, that improper and inconsistent jury instructions were given to the jury. The Court finds that the jury instructions, taken as a whole, correctly and clearly informed the jury of the relevant law. Thus, there is no merit to this particular claim.

"E. Defendant says, under his ISSUE V, that the Court should have specifically charged the jury on the meaning of the word 'intent' when it employed that word in defining the concept of 'possession' for the jury. In the context there used, however, intent had its usual and ordinary meaning, being the equivalent of 'purpose,' and no further definition was necessary. Simply put, every word spoken by a judge does not have to be defined for a jury for them to understand what is meant. Moreover, it is clear that the word 'intent,' in the context of the Court's charge on possession, was fully comprehensible, so that no prejudice was suffered by defendant in not having a specific definition given for it.

"F. Finally, the defendant complains that the indictment in his case was framed so as to allow the District Attorney, in proving Unlawful Manufacture of a Controlled Substance I, to show that, in conjunction with defendant's manufacture of methamphetamine, 'a clandestine laboratory operation was to take place within 500 feet of a residence, place of business, church or school, to-wit: 10957 Salem Church Road, Andalusia, Alabama....' He then avers that the State's proof was defective upon the allegation thus laid. If so, however, that fact is of no consequence, because alternative allegations of sufficient legal effect were proven, and the Court did not send the allegation that defendant has cited to the jury. Thus, there is not merit to this particular claim."

The record supports the circuit court's findings, and we adopt them as part of this memorandum. Because the underlying claims were without merit, there was not a basis for an objection by trial counsel, and appellate counsel did not render ineffective assistance by not challenging trial counsel's performance on these grounds on appeal. Accordingly, the circuit court properly summarily dismissed the appellant's petition, see Rule 32.7(d), Ala. R. Crim. P., and we affirm the circuit court's judgment.

*Respondents' Exhibit 12 - Doc. No. 11-17* at 2-5.   Clements filed an application for rehearing which the Alabama Court of Criminal Appeals overruled on May 8, 2009. *Respondents' Exhibit 14 - Court Doc. No. 11-19*.   Clements filed a petition for writ of certiorari with the Alabama Supreme Court.   The Alabama Supreme Court denied the petition for writ of certiorari on June 12, 2009, *Respondents' Exhibit 16 - Court Doc. No. 11-21*, and the certificate of judgment issued on this same date.   *Respondents' Exhibit 17 - Court Doc. No. 11-22*.

Clements initiated this 28 U.S.C. § 2254 action on July 19, 2009.   In this petition for habeas relief, Clements asserts the following claims for relief:

1.   The trial court erred in denying the petitioner's motion to suppress because the search occurred upon the demand of law enforcement officers.

2.   Appellate counsel rendered ineffective assistance when he failed to raise on appeal trial counsel's failure to object to:  (i) the trial court's alleged improper jury instruction that the visual aids used by Officer Dean in explaining the process of manufacturing methamphetamine were seized from the petitioner, (ii) the search and seizure of the surveillance monitor located in the outbuilding, (iii) admission of forensic evidence by the forensic chemist regarding the presence of methamphetamine as the chemist allegedly altered the substances during his analysis such that the substances no longer remained in the same condition as when seized from the petitioner, (iv) the trial court's jury instructions on accomplice liability, (v) the trial court's jury

instruction on possession due to the court's failure to define intent, and (vi) the trial court's failure to instruct the jury on the purported essential element that the clandestine laboratory operation took place within 500 feet a residence.

*Memorandum in Support of Petition for Writ of Habeas Corpus - Doc. No. 2* at 1-10.

In their answer to the petition, the respondents argue Clements is entitled to no relief from this court as the state courts properly adjudicated each of his claims on the merits. *Price v. Vincent*, 538 U.S. 634, 638, 123 S.Ct. 1848, 1852 (2003) ("A habeas petitioner whose claim was adjudicated on the merits in state court is not entitled to relief in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)."); *Williams v. Taylor*,529 U.S. 362, 402, 120 S.Ct. 1495, 1518 (2000). Moreover, it is clear to the court that Clements' claims challenging the constitutionality of the search of his residence and property adjacent to the residence and the seizure of evidence during the search are barred by the doctrine established in *Stone v. Powell*, 428 U.S. 465 (1976). In *Stone*, the Supreme Court held that where a state provides an opportunity for full and fair litigation of a Fourth Amendment claim the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. Thus, because the state courts provided Clements an opportunity for full and fair litigation of his Fourth Amendment claims, habeas corpus relief in this court may not be granted.

Upon review of the § 2254 petition, the answer of the respondents, Clements'
response to the answer, the state court record, orders/opinions issued by the state courts and
applicable federal law, this court finds no evidentiary hearing is required, Rule 8(a), *Rules
Governing Section 2254 Cases in United States District Courts*, and concludes the petition
is due to be denied.

## II. ANALYSIS OF CLAIMS

The instant petition for federal habeas relief is governed by 28 U.S.C. § 2254, as
amended by the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"].  "A habeas
petitioner whose claim was adjudicated on the merits in state court is not entitled to relief
in federal court unless he meets the requirements of 28 U.S.C. § 2254(d)."  *Price*, 538 U.S.
634, 638, 123 S.Ct. 1848, 1852; *Williams*, 529 U.S. 362, 402, 120 S.Ct. 1495, 1518.  Under
the requisite provisions of 28 U.S.C. § 2254(d), with respect to a claim adjudicated on the
merits in state court, federal habeas relief from a state court judgment may not be granted
unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in
> the State court proceeding.

In *Williams*, the Supreme Court held:

> Under the "contrary to" clause a federal court may grant the
> writ if the state court arrives at a conclusion opposite to that
> reached by this Court on a question of law or if the state court
> decides a case differently than this Court has on a set of
> materially indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant the writ
> if the state court identifies the correct governing legal principle
> from this Court's decisions but unreasonably applies that
> principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. at 1523.

The Supreme Court subsequently explained habeas relief is appropriate when a

petitioner demonstrates "that a decision by a state court is 'contrary to' ... clearly

established [Supreme Court] law if it 'applies a rule that contradicts the governing law set

forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially

indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a

result different from [Supreme Court] precedent.' *Williams v. Taylor*, 529 U.S. 362, 405-

406, 120 S.Ct. 1495, 146 L.Ed. 2d 389 (2000)." *Price*, 538 U.S. at 640, 123 S.Ct. at 1853.

Additionally, federal review in a habeas action "is limited to whether the state court's

decision was objectively unreasonable in the light of clearly established federal law.

*Williams*, [529 U.S. at 409],120 S.Ct. at 1521." *Hawkins v. Alabama*, 318 F.3d 1302, 1310

(11th Cir. 2003); *Parker v. Head*, 244 F.3d 831, 835 (11th Cir. 2001), citing *Williams*, *supra*

("[F]ederal habeas relief [is] available under the 'unreasonable application' standard only

if the state court's application of clearly established federal law was 'objectively

25

unreasonable.'").  Thus, a federal court is not to decide "the correctness *per se* ... of the state court decision" but only the "objective reasonableness" of such decision.  *Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001).  Moreover, "an ***unreasonable*** application of federal law is different from an ***incorrect*** application of federal law."  *Williams*, 529 U.S. at 410, 120 S.Ct. at 1522 (emphasis in original).  "Under § 2254(d)(1)'s 'unreasonable application' clause, ... a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  529 U.S. at 411, 120 S.Ct. at 1522.

Federal district courts are likewise directed to determine whether the state court based its findings on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  A state court's determinations of fact shall be "presumed to be correct," and the habeas petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  However, even when the state court addresses a question of law, this court is not authorized "to evaluate [a petitioner's] claim *de novo* rather than through the lens of § 2254(d)."  *Price*, 538 U.S. at 639, 123 S.Ct. at 1852.  The Supreme Court admonishes that such *de novo* evaluation "exceeds the limits imposed on federal habeas review by 28 U.S.C. § 2254(d)...."  538 U.S. at 636, 123 S.Ct. at 1851.  As

is clear from the foregoing, a federal "district court's review ... [of claims decided by the state courts] is greatly circumscribed and highly deferential to the state courts." *Crawford v. Head*, 311 F.3d 1288, 1295 (11th Cir. 2007). The AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002).

     1. Search of Residence and Outbuildings/ Seizure of Evidence.[7] The trial court held a suppression hearing on Clements' motion to suppress at which time Clements maintained he did not consent to the search. After hearing testimony regarding the search from both law enforcement officials and Clements, the trial court denied the motion to suppress. *Respondents' Exhibit 1 (Part 1) - Doc. No. 11-1* at 145.

     On direct appeal, Clements argued the trial court erred in denying his motion to suppress because law enforcement officials had no reasonable suspicion upon which to ask for his consent to search and his verbal consent to the search occurred only because he felt compelled to acquiesce to the demands made by law enforcement officials. *Respondents' Exhibit 2 - Doc. No. 11-7* at 37-43. The Alabama Court of Criminal Appeals determined these arguments adversely to Clements. *Respondents' Exhibit 4 - Doc. No. 11-9* at 4-6. (Initially, the appellate court deemed the claims barred from review because "Clemments

---

[7] Both in the state courts and before this court, Clements limits his claims to the search of his property as he asserts no protected interest in the truck owned by Joseph Thompson.

did not object at the suppression hearing based on the grounds he now argues on appeal."

The court further found the claims without merit as "there was sufficient evidence from

which the trial court could determine that [the petitioner] did, in fact, consent to the

search.").[8]

The Alabama Court of Criminal Appeals did not decide Clements' claims

challenging the search and seizure "differently than [the Supreme] Court has [in a case

based] on a set a of materially indistinguishable facts" nor did the state courts apply a rule

that contradicts governing federal law.  *Williams*, 529 U.S. at 413, 120 S.Ct. at 1523.

Consequently, the state appellate court's rejection of the claims related to the search of

Clements' property and seizure of evidence pursuant to this search was not contrary to

actual Supreme Court decisions.  Further, a thorough review of the evidentiary materials

---

[8] To the extent this claim entails an allegation of the lack of consent to search, Clements did not raise this specific challenge on direct appeal.  Thus, such failure likewise constitutes a procedural default of this ground for relief. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 1732-1733 (1999) ("[S]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process," including review by the state's court of last resort, even if review in that court is discretionary.); *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003) ("Nothing in *Boerckel's* reasoning suggests that a different rule should apply in state post-conviction appeals as opposed to direct appeals."); *Smith v. Jones*, 256 F.3d 1135, 1140 (11th Cir. 2001), *cert. denied*, 534 U.S. 1136, 122 S.Ct. 1081, 151 L.Ed.2d 982 (2002) ("Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the *Boerckel* rule."); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002); *Holladay v. Haley*, 209 F.3d 1243, 1254 n. 9 (11th Cir.), *cert denied*, 531 U.S. 1017 (2000); *Bailey v. Nagle*, 172 F.3d 1299, 1303 (11th Cir. 1999); *Atkins v. Singletary*, 965 F.2d 952, 955 (11th Cir. 1992); *Collier v. Jones*, 901 F.2d 770, 773 (11th Cir. 1990).  In order to provide the state courts with the requisite full and fair opportunity to address his claims, "the petitioner [must] 'fairly present' his federal claims to the state courts in a manner to alert them that the ruling under review violated a federal constitutional right.  *Duncan v. Henry*, 513 U.S. 364, 365-66, 115 S.Ct. 887, 888, 130 L.Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971)).  Exhaustion is not satisfied 'merely' if the petitioner presents the state court with 'all the facts necessary to support the claim' or even if a 'somewhat similar state-law claim was made.'  *Kelley v. Sec'y for Dept. of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (citation omitted)."  *Pearson v. Sec'y for Dept. of Corr.*, 273 Fed.Appx. 847, 849-850 (11th Cir. 2008).

submitted in this case establishes that the state court's decision was objectively reasonable and likewise constituted a reasonable determination of the facts in light of the evidence presented by the parties.  Thus, Clements is not entitled to relief from this court on his challenges to the admission of evidence obtained pursuant to the challenged search and seizure.

In addition, as previously discussed, the claims arising under the Fourth Amendment challenging the search which led to the seizure of evidence made the basis of Clements' convictions are precluded from review by this court because Clements had a full and fair opportunity to litigate such claims in the state courts.  *Stone*, 428 U.S. at 494.  "'[F]ull and fair consideration' in the context of the Fourth Amendment includes 'at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when there are facts in dispute, and full consideration by an appellate court when the facts are not in dispute.'  *Carver v. Alabama*, 577 F.2d 1188, 1191 (5th Cir. 1978)."  *Bradley v. Nagle*, 212 F.3d 559, 565 (11th Cir. 2000), *cert. denied*, 531 U.S. 1128, 121 S.Ct. 886 (2001).  During the proceedings before the Circuit Court of Covington County, Clements, through counsel, presented a motion to suppress challenging the actions surrounding the search which resulted in the seizure of methamphetamine and drug paraphernalia.  The trial court conducted a hearing on this motion.  Based on the evidence presented at this hearing, the court denied the motion to suppress.  On direct appeal, Clements again challenged the

constitutionality of the search of his residence and adjacent property.  The Alabama Court of Criminal Appeals likewise denied Clements relief.  In light of the foregoing, the court concludes the State afforded Clements an opportunity for full and fair consideration of any Fourth Amendment claims challenging the validity of the search through available state court proceedings.  Consequently, these claims are precluded from federal habeas review.  *Stone*, 428 U.S. at 494; *Bradley*, 212 F.3d at 564-565.

2.  <u>Ineffective Assistance of Appellate Counsel</u>.  Clements maintains appellate counsel failed to raise claims of ineffective assistance of trial counsel on appeal from his convictions.  The claims of ineffective assistance of appellate counsel presented to this court are the same as those presented to the state courts in the Rule 32 proceedings and deemed without merit by those courts.

In addressing each of Clements' claims of ineffective assistance of appellate counsel, the Alabama Court of Criminal Appeals applied *Strickland v. Washington*, 466 U.S. 668 (1984) and decided these claims adversely to Clements on the merits. *Respondents' Exhibit 12 - Doc. No. 11-17* at 2-5, quoted *infra.* at 19-21.  Specifically, the Alabama Court of Criminal Appeals thoroughly reviewed the claims of ineffective assistance of trial counsel on which Clements based his claims of ineffective assistance of appellate counsel and determined the claims of ineffective assistance of trial counsel lacked merit.  *Respondents' Exhibit 12 - Doc. No. 11-17* at 2-5.  Consequently, the court held that

appellate counsel had not provided ineffective assistance to Clements on direct appeal. *Id*. at 5 ("Because the underlying [substantive] claims were without merit, there was not a basis for an objection by trial counsel, and appellate counsel did not render ineffective assistance by not challenging trial counsel's performance on these grounds on appeal.").

*Strickland* sets forth the clearly established federal law on the issue of ineffective assistance of counsel. Thus, this court will determine whether rejection of Clements' claims of ineffective assistance of counsel by the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Sixth Amendment right to counsel exists to protect the fundamental right to a fair trial. The petitioner must satisfy the requirements of a two-pronged test to prevail on his claims of ineffective assistance of counsel. First, the petitioner must establish that the performance of his attorneys "fell below an objective standard of reasonableness." *Strickland* 466 U.S. at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id*. Once this threshold test is met, the petitioner must then show that the deficient performance of his counsel prejudiced his defense. *Id*. at 687. To establish prejudice, the petitioner is required to show there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. Unreliability or unfairness does not

31

result if counsel's ineffectiveness does not deprive the defendant of any substantive or procedural right to which the law entitles him. *Williams v. Taylor*, 529 U.S. at 393 n. 17 (2000). There is a strong presumption that counsel's performance was reasonable and adequate and great deference is shown to choices dictated by reasonable trial strategy. *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Any review of an ineffective assistance of counsel claim is conducted from the perspective of defense counsel based on facts "as they were known to counsel at the time of the representation." *United States v. Teague*, 953 F.2d 1525, 1535 (11th Cir. 1992).

The test used to evaluate claims of ineffective assistance of trial counsel applies equally to an analysis of claims of ineffective assistance of appellate counsel. *Jackson v. Dugger*, 931 F.2d 712, 715 (11th Cir. 1991). Appellate counsel cannot be deemed ineffective for failing to raise meritless claims on appeal. *Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000); *Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994) ("[I]t is axiomatic that the failure to raise nonmeritorious issues does not constitute ineffective assistance.").

This court must first resolve whether the Alabama Court of Criminal Appeal's decision to reject the ineffective assistance of appellate counsel claims was an unreasonable application of the *Strickland* standard.

> In determining whether the state court's decision is an unreasonable application of the law set out in [applicable]

Supreme Court decisions, we need not decide whether we would have reached the same result as the state court if we had been deciding the issue in the first instance. Instead, we decide only whether the state court's decision of the issue is objectively unreasonably. *See Williams v. Taylor*, 529 U.S. 362, 411, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000) ("Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."); *Brown v. Head*, 272 F.3d 1308, [1313] (11th Cir. 2001)("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide.").

*Wright v. Secretary for the Dept. of Corrections*, 278 F.3d 1245, 1256 (11th Cir. 2002).

The Alabama Court of Criminal Appeals applied *Strickland* in its review of Clements' claims challenging the actions of appellate counsel, and by logical extension his underlying claims of ineffective assistance of trial counsel, and determined Clements failed to establish either trial or appellate counsel provided ineffective assistance. Upon thorough review of the evidentiary materials submitted in this case, it is clear the rejection of Clements' ineffective assistance of appellate counsel claims by the state court was objectively reasonable as Clements failed to show that the performance of counsel fell below a subjective standard of reasonableness. The Alabama Court of Criminal Appeals likewise did not decide Clements' claims of ineffective assistance of appellate counsel "differently than [the Supreme] Court has [in a case based] on a set a of materially

indistinguishable facts" nor did the state court apply a rule that contradicts governing federal law. *Williams*, 362 U.S. at 412.  Consequently, the state appellate court's rejection of these claims was not contrary to actual Supreme Court decisions or an unreasonable application of clearly established federal law.  In addition, the findings made by the Alabama Court of Criminal Appeals on each of Clements' claims of ineffective assistance of appellate counsel constituted reasonable determinations of the facts in light of the evidence presented by the parties. Habeas relief is therefore unwarranted on Clements' claims of ineffective assistance of appellate counsel arising from the failure to raise claims of ineffective assistance of trial counsel on direct appeal.

### III. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The petition for habeas corpus relief filed by Joseph Elbert Clements be DENIED.

2.  This case be DISMISSED with prejudice.

It is further

ORDERED that on or before May 17, 2012 the parties may file objections to the Recommendation.  Objections must specifically identify the findings in the Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this

Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings in this Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982); *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*) (adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to September 30, 1981).

Done this 2nd day of May, 2012.


/s/Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE